McGuireWoods LLP
One James Center
901 East Cary Street
Richmond, VA 23219-4030
Phone: 804.775.1000
Fax: 804.775.1061
www.mcguirewoods.com

Timothy J. Heaphy
Direct: 804.775.4744

theaphy@mcguirewoods.com
Direct Fax: 804.698.2068

# McGUIREWOODS

May 13, 2008

The Honorable Kenneth M. Karas
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, NY 10601-4150

Re: United States v. Timothy Montgomery, 05-CR-1067 (12)

Dear Judge Karas:

My client Timothy Montgomery will appear before this Court for sentencing on May 16, 2008. To assist the Court's determination of sentence, we submit the following information about Mr. Montgomery and the offenses to which he pleaded guilty.[1]

We specifically request that Mr. Montgomery be given credit for his acceptance of responsibility for the offenses charged in this case. Mr. Montgomery has strongly and unequivocally admitted guilty and acknowledged his role in the instant offenses, a fact which is unaffected by his recent arrest in the Eastern District of Virginia. We further submit that the seriousness of the offenses to which Mr. Montgomery has pleaded guilty is mitigated by the relative lack of success which Mr. Montgomery obtained within this criminal venture. His participation in the bad check scheme was encouraged by his coach, his manager, and the mother of his child, all of whom had a powerful influence on Mr. Montgomery. Finally, Mr. Montgomery has personal qualities which justify mercy and leniency. We ask the Court to consider all of these factors in determining the appropriate sentence for Mr. Montgomery.

I.  Acceptance of Responsibility

On April 9, 2007, Mr. Montgomery pleaded guilty to two counts of conspiracy to commit bank fraud and one substantive count of bank fraud before this Court. The plea agreement which Mr. Montgomery signed with the United States contemplates that he will receive a two-level

---

[1] We respectfully request that this Court accept and consider this letter despite the fact that it was submitted beyond the deadline established in this Court's Individual Rules of Practice for Sentencing Proceedings. Our delay in submitting this letter is attributable to Mr. Montgomery's arrest on unrelated charges in Virginia and the potential impact of those charges on the instant case. We ask that the Court excuse our tardy filing, and we hope that the Court has ample time to consider the facts herein before the May 16, 2008 sentencing hearing.

May 13, 2008
Page 2

decrease in his base offense level for acceptance of responsibility. Plea Agreement at p. 2. The government now takes the position that Mr. Montgomery is not entitled to that two-level decrease for acceptance, based on Mr. Montgomery's recent arrest in the Eastern District of Virginia.[2] We submit that Mr. Montgomery's recent arrest does not diminish his unequivocal acceptance of responsibility for the offenses involved in the instant case. To remove his acceptance credit would represent premature adjudication and punishment for that alleged offense, of which he has not yet been convicted. Moreover, denying him acceptance credit would unfairly punish Mr. Montgomery twice for that alleged offense.

Section 3E1.1(a) of the Guidelines provides that a defendant should be given a two level decrease in his offense level "if [he] clearly demonstrates acceptance of responsibility for his offense." The comments to § 3E1.1 suggest that a plea of guilty and admission of guilt of the charged offense in the PSI normally entitle a defendant to credit for acceptance of responsibility pursuant to that provision of the Guidelines:

> Entry of a plea of guilty prior to the commencement of a trial combined with truthfully admitting the conduct comprising the offense of conviction, . . . will constitute significant evidence of acceptance of responsibility.

U.S.S.G. § 3E1.1, Application Note 3. The Note does indicate that such evidence "may be outweighed by conduct of the defendant which is inconsistent with such acceptance of responsibility."

The effect of a subsequent arrest on a defendant's acceptance of responsibility has been variously interpreted in different Circuits. The Second Circuit has held that "the fact that a defendant commits a second crime after pleading guilty and while awaiting sentencing for a first offense is a relevant consideration in denying the acceptance of responsibility adjustment in selecting the sentence for that first offense. The second crime refutes the disavowal of future criminal activity implied by the guilty plea to the first crime." *United States v. Rodriguez*, 928 F.2d 65, 67 (2d Cir. 1991) (addressing case where defendant was denied acceptance of responsibility adjustment at sentencing for the second crime). This holding is based on the Application Note 1(b) to Section 3E1.1, which states that "voluntary termination or withdrawal from criminal conduct or associations," is one factor that may be considered in determining whether the defendant has accepted responsibility. However, the grant or denial of an adjustment based on acceptance of responsibility is not automatic. *United States v. Holmes*, 205 F.3d 1325, *2 (2d Cir. Feb. 18, 2000). Rather, "an individualized determination is required." *Rodriguez*, 928 F.2d at 67.[3]

---

[2] The author of the PSI agrees with the government and does not recommend that Mr. Montgomery be given credit for acceptance of responsibility (PSI, § 153).

[3] *See also United States v. Olvera*, 954 F.2d 788, 793 (2d Cir. 1992) (finding that district court had not erred in denying credit for acceptance of responsibility where defendant had smuggled marijuana into jail while awaiting sentencing); *United States v. Fernandez*, 127 F.3d 277, 285 (2d Cir. 1997) (holding that district court did not err in denying Section 3E1.1(a) adjustment where defendant had obstructed justice by offering to bribe a judge while

May 13, 2008
Page 3

      The Sixth Circuit reached a contrary view on this issue, explicitly finding that a pre-sentencing arrest on an unrelated offense has no bearing on a defendant's acceptance of responsibility for a prior, unrelated crime. In *United States v. Morrison*, 983 F.2d 730, 755 (6th Cir. 1993), the Court of Appeals specifically held that "acceptance of responsibility, as contemplated by the United States Sentencing Commission, is 'acceptance of responsibility *for his offense*,' not for 'illegal conduct' generally. Considering unrelated criminal conduct unfairly penalizes a defendant for a criminal disposition, when true remorse for specific criminal behavior is the issue." *See also United States v. Banks*, 252 F.3d 801, 806-07 (6th Cir. 2001).

      The Second Circuit has thus far refused to recognize an exception to the rule set forth in *Rodriguez* when the subsequent criminal conduct was unrelated to the offense of conviction. *See United States v. Darling*, 1 Fed. Appx. 60, 62 (2d Cir. Jan. 11, 2001) ("Darling has said nothing that would incline us to replace this rule with the *Morrison* rule."). Accordingly, this Court has discretion to consider Mr. Montgomery's subsequent arrest in its evaluation of his acceptance of responsibility for the bank fraud offenses at issue here. Such consideration should not, however, equal automatic denial of acceptance credit when a defendant is arrested for an unrelated offense pending sentencing. We submit that there are strong reasons why this Court, in the exercise of its discretion, should give Mr. Montgomery acceptance credit, as contemplated in the plea agreement.

      First and most importantly, Mr. Montgomery has clearly demonstrated acceptance of responsibility for the offenses which are before this Court for sentencing. He pleaded guilty to those offenses, directly admitting his guilt to this Court. He has similarly admitted guilt to the author of the Presentence Report. In fact, Mr. Montgomery has gone beyond simple admission of guilt and expressed remorse for his crimes. As the Presentence Investigation indicates, Mr. Montgomery stated "I'm very angry at myself" for participating in this criminal venture. He has called this episode "an embarrassing moment in [his] life." He has admitted the facts of his involvement and expressed remorse – a strong demonstration of the type of acceptance contemplated by the Guidelines.

      The offenses with which he has been recently charged in Virginia are completely unrelated to those involved in the instant case. Mr. Montgomery truthfully and candidly admitted his involvement in accepting and attempting to cash counterfeit checks. This crime is of a fundamentally different character than that charged in Virginia. Mr. Montgomery's alleged co-conspirators in the Virginia case are completely distinct from those involved in this matter. The bank fraud occurred in 2005. The drug conspiracy charged in Virginia did not allegedly begin occur until August of 2007. The bank fraud was based in New York, whereas the drug conspiracy is allegedly based in Virginia. Of course, the allegations in the Virginia case carry much more serious mandatory penalties than the crimes to which Mr. Montgomery has pleaded guilty in the instant case. The distinctions between these two separate cases are legion.

---

purporting to cooperate with the government – but court also noted that guidelines provide that obstruction enhancement is generally inconsistent with acceptance of responsibility).

May 13, 2008
Page 4

The most significant difference between the two cases at present is the fact that Mr. Montgomery has not yet been convicted of the alleged conspiracy in Virginia. The judicial process in the Eastern District of Virginia has not yet run its course. While allegations have been made against Mr. Montgomery, those allegations have not been proven and may not result in a criminal conviction. To deny Mr. Montgomery acceptance credit because of the allegations in Virginia would be patently unfair, given the pendency of the proceedings in Virginia. It is premature to deny Mr. Montgomery credit for acceptance, as an arrest does not rise to the level of a criminal conviction. The charges against Mr. Montgomery in Virginia will be adjudicated in that jurisdiction. If he is found guilty, Mr. Montgomery will be held accountable in that case. To punish him in the instant case would constitute unreasonable double-counting, particularly at this early stage of the Virginia proceedings.

Mr. Montgomery has definitely admitted his guilt in the case pending before this Court. He has expressed remorse for his actions in this matter. This Court should credit that acceptance and give Mr. Montgomery the benefit of the 2-level decrease provided by § 3E1.1(a). If this Court grants our request for the application of the acceptance provision, Mr. Montgomery's adjusted offense level would be 21, resulting in a recommended Guidelines sentence of 37-46 months.

II.   Offenses of Conviction

The facts and circumstances surrounding those offenses are accurately outlined in the Presentence Investigation Report ("PSI"). The charged offenses are serious and merit punishment of the defendant by this Court. As he admitted to this Court at the time of his plea, Mr. Montgomery willingly participated in a scheme to defraud financial institutions of significant amounts of money. He did so on several occasions, with the assistance and cooperation of his co-defendants. He acknowledges the gravity of his mistake and is prepared to accept the consequences of his actions.

A.   Lack of Success

Without diminishing Mr. Montgomery's remorse or acceptance of responsibility for his mistakes, there are two particular circumstances of these offenses which we ask the Court to consider when it imposes sentence in this matter. The first is the relatively small amount of financial benefit which Mr. Montgomery obtained during the course of this conspiracy. Mr. Montgomery was largely unsuccessful in cashing the counterfeit checks at issue in this case. His lack of success mitigates the seriousness of his criminal activity and should be an important factor in this Court's sentencing determination.

During the course of his participation in this conspiracy, Mr. Montgomery obtained only $20,000 from the various counterfeit checks which were cashed or attempted to be cashed. That $20,000 represented Mr. Montgomery's broker's fee for introducing his friend Anthony Prince to his then-coach, Steven Riddick after Riddick had successfully cashed a $375,000 check received

May 13, 2008
Page 5

from Prince. While Mr. Montgomery did receive or direct several checks in larger amounts, none of those checks were cashed by the banks involved. Again, the only money which Mr. Montgomery actually obtained from this criminal enterprise was the $20,000 broker's fee he received from Riddick.

The loss amount stipulated in the plea agreement is between $1,000,000 and $2,500,000 million – amounts far in excess of Mr. Montgomery's $20,000 total profit. Those amounts almost entirely represent intended rather than actual loss. As indicated above, Mr. Montgomery's co-defendant Steven Riddick was able to cash one check in the amount of $375,000. None of the other checks which make up the loss amount for which Mr. Montgomery is responsible were cashed. While he is legally responsible for that intended loss, the fact that only one of the checks was successfully cashed mitigates that loss.

Mr. Montgomery's personal share of the proceeds pales in comparison to the amounts received by his co-conspirators. Mr. Riddick distributed approximately $34,000 to Anthony Prince and his associates (PSI at ¶82). He distributed more than $200,000 to co-conspirators in New York (PSI at ¶ 76 – 81). Mr. Riddick kept a sum greater than $20,000 for himself. Accordingly, Mr. Montgomery received the smallest slice of the pie which is attributable to him and actually consumed by these conspirators. His relative culpability is consequently lesser than that of his co-defendants.[4]

    B.    <u>Influence of Authority Figures</u>

Mr. Montgomery's involvement in the charged bank fraud conspiracy began when he was approached by Anthony Prince, an associate in Norfolk, Virginia. Mr. Prince approached Mr. Montgomery and introduced him to Douglas Shyne, the leader of the charged conspiracy who was based in New York. After Mr. Prince and Mr. Shyne outlined the scheme to Mr. Montgomery, he immediately turned to the people closest to him for advice – his coach, his agent, and the mother of his child. None of those people discouraged Mr. Montgomery from participating in the scheme. Conversely, each of them became willing participants themselves in the illegal conspiracy.

    1.    <u>Steven Riddick</u>

At the time he participated in the bank fraud conspiracy, Mr. Montgomery was a world-class sprinter. He was engaged in active competition in professional track events around the world. His coach at the time was Steven Riddick, a man who Mr. Montgomery had known for more than 10 years. Riddick was a former Olympic champion track athlete himself. He had coached Mr. Montgomery for many years, beginning when Mr. Montgomery was a college student at Norfolk State University.

---

[4] The New York defendants, with whom Mr. Montgomery was not acquainted, obtained much more than Mr. Montgomery or the other Virginia defendants involved in this conspiracy.

Riddick was more than a coach to Mr. Montgomery. He was a mentor, big brother, and confidante to the younger Montgomery. Riddick supervised Mr. Montgomery's training sessions, preparing him for the world-class competition in which he was engaged. He also coached Mr. Montgomery's then-girlfriend Marion Jones, a relationship facilitated by Mr. Montgomery. Mr. Riddick became close to both Mr. Montgomery and Ms. Jones and provided advice and counsel to them which extended beyond the track. It was natural that Mr. Montgomery would come to Riddick with the prospect of the easy money this scheme seemingly offered. He turned to the person who had the most influence over his life, his coach and close friend Steven Riddick.

When Mr. Montgomery asked Mr. Riddick's opinion about the illegal check scheme, Mr. Riddick affirmatively encouraged Mr. Montgomery's participation. Riddick spoke to an employee of his who had worked in a bank – Anthony Hockaday. When Riddick learned that the deposits of banks were covered by insurance, he told Mr. Montgomery that there was little risk of apprehension for his participation in the counterfeit check scheme. As a manifestation of his false confidence, Riddick affirmatively joined the conspiracy. Mr. Montgomery introduced Riddick to Anthony Prince, after which Prince and Riddick began negotiating directly. In short, Mr. Montgomery's coach and guiding influence did not discourage him from joining this criminal venture. To the contrary, the coach wanted in and joined the conspiracy himself, which strongly influenced Mr. Montgomery's personal participation.

    2.    <u>Charles Wells</u>

Another person to whom Mr. Montgomery turned for advice when the scheme was introduced was his agent, Charles Wells. Wells had managed Mr. Montgomery's financial affairs and appearances for several years, through his company Vector Sports. Wells was responsible for negotiating all of Mr. Montgomery's appearance contracts, obtaining and maintaining endorsements, and generally promoting Mr. Montgomery's career. Mr. Montgomery trusted Mr. Wells to enhance his public image and translate his athletic success into financial reward.

Mr. Wells was successful in his role as Mr. Montgomery's agent. He negotiated an endorsement contract with the Nike shoe company which was lucrative for Mr. Montgomery. He ensured that Mr. Montgomery could command the highest appearance fees at track meets around the world. He fielded and screened requests for Mr. Montgomery's time. He arranged all of Mr. Montgomery's athletic competitions and personal appearances. Mr. Montgomery was so pleased with Wells' work as his agent that he convinced Marion Jones to begin using Wells and Vector Sports as well. Wells began exploiting opportunities that Mr. Montgomery's relationship with Ms. Jones presented, pursuing joint personal appearances, book and other publication deals.

Mr. Montgomery does not have a college degree and had never been employed in a business of any kind. He had absolutely no experience with financial matters and was incapable of handling his own affairs. He consequently relied heavily upon the management and advice of

May 13, 2008
Page 7

Mr. Wells. Wells' success only increased Mr. Montgomery's trust in and reliance upon Mr. Wells. Wells' joint representation of Ms. Jones and Mr. Montgomery solidified his influence on Mr. Montgomery.

Again, it was natural that Mr. Montgomery would turn to Mr. Wells for advice when the counterfeit check scheme arose. Mr. Montgomery introduced Mr. Wells to Anthony Prince, the source of the counterfeit checks. Mr. Prince then directly negotiated with Mr. Wells and arranged for Mr. Wells to receive several large counterfeit checks that were to be deposited into accounts which Wells had established for Mr. Montgomery. Rather than discourage Mr. Montgomery from participating in the scheme, Mr. Wells personally took part and received counterfeit checks. For his role in this conspiracy, Mr. Wells has pleaded guilty and been sentenced by this Court.

Like Mr. Riddick, Mr. Wells was an authority figure whose advice Mr. Montgomery trusted, particularly in financial matters. Also like Riddick, Mr. Wells did not in any way discourage Mr. Montgomery from participating in the bad check scheme. The fact that two authority figures participated in this scheme after Mr. Montgomery brought it (and Mr. Prince) to them encouraged Mr. Montgomery's participation and diminished his sense of responsibility. He relied upon the bad advice of these two men to his extreme detriment.

3.  Marion Jones

Mr. Montgomery was living with Ms. Jones at the time of his participation in the bank fraud scheme. They had a child in common who they were raising together. They were both competing at the highest level in the high-stakes world of professional track and field. They shared every day, every experience, and every relationship. Ms. Jones was closer to Mr. Montgomery emotionally than any other person in his life at the time that the check scheme was hatched.

Mr. Montgomery discussed the prospect of participation in the bad check scheme with Ms. Jones before he agreed to take part. As described in paragraph 139 of the PSI, Ms. Jones "really didn't say nothing at all" when Mr. Montgomery asked her opinion of the scheme. Her acquiescence was significant to Mr. Montgomery, who understandably interpreted it as permission.

Ms. Jones' acquiescence in the scheme later ripened into direct involvement in the conspiracy. As detailed in the PSI, Ms. Jones ultimately became a participant in the conspiracy and obtained money as part of the scheme. Ms. Jones directly received the benefit of another counterfeit check which had been successfully cashed by Nathaniel Alexander, a close associate of Steven Riddick. After Alexander cashed the large counterfeit check, Mr. Riddick directed a

May 13, 2008
Page 8

portion of the proceeds to Ms. Jones. She ultimately received $25,000 of proceeds of this conspiracy, an act which represented her willing participation in the scheme. (PSI, ¶ 93).[5]

In sum, Mr. Montgomery's decision to participate in this bank fraud conspiracy was informed by the affirmative approval or acquiescence of three people who he trusted. Riddick, Wells and Jones each played a role in encouraging Mr. Montgomery to associate with this criminal venture. To be fair, Mr. Montgomery was warned against participation in the bank fraud conspiracy by his mother. Her good advice was, however, overwhelmed by the approval of Mr. Montgomery's coach, manager and girlfriend. Their personal participation in the conspiracy had a powerful influence on Mr. Montgomery, as it gave him a false sense of safety and undercut his sense that the endeavor was wrong.

The influence that those three individuals had on Mr. Montgomery does not excuse his conduct. It provides no defense or justification for his actions. He does not blame them for his choice to involve himself in this endeavor. Their role in encouraging him to participate in this conspiracy is offered to this Court not as an excuse, but rather as a mitigating factor. His reliance on these three people is an important factor to balance against the seriousness of the offense and the loss involved.

III.    Character Evidence

The PSI provides important information about Mr. Montgomery's personal and family history. It sets forth information about his parents, siblings, children and other close relatives. It describes his upbringing and educational history. It details his significant athletic accomplishments. It develops his post-track economic difficulties and current personal and financial situation. We will not restate that information here, other than to suggest that it shows that Mr. Montgomery was the product of a good family and had ample support growing up. That support remains and will help Mr. Montgomery cope with the aftermath of these offenses.

At the sentencing hearing in this matter, we will present further information about Mr. Montgomery's personal history and background. We will present testimonials from people who know Mr. Montgomery and have a favorable opinion of his character. We believe that the character evidence will provide this Court with a more complete understanding of Mr. Montgomery. We believe that the information we will present will support our request for mercy and leniency.

IV.    Conclusion

We respectfully request that this Court consider the information set forth in this letter, the other submissions received by the Court in this matter, and the further information to be provided at the sentencing hearing. We believe that Mr. Montgomery has earned credit for acceptance of

---

[5] Ms. Jones pleaded guilty to lying to investigators about her knowledge of and participation in the bad check conspiracy and an unrelated federal investigation. (PSI, ¶ 24).

May 13, 2008
Page 9

responsibility, and we request that the Court give him such credit when determining the recommended guideline in this matter. We further believe that Mr. Montgomery's lack of success in this venture and the strong encouragement to participate provided by his influential co-conspirators substantially mitigate Mr. Montgomery's serious criminal conduct.

Sincerely,

Timothy J. Heaphy
Counsel to Timothy Montgomery